The opinion of the Court was delivered by
Wardlaw, J.
The suggestion of the relator, James Bruce, *264 and the answer thereto filed by the tax collector, show the following case:
James Bruce, as agent of Eli M. Bruce and others, bought cotton during the late war, and had many bales in store, in Abbeville District, in May, 1865. The Legislature, in December, 1865, laid a tax upon all cotton sold between May and October, 1865, and a tax upon cotton in hand on the first day of October, 1865. The tax collector, in June, 1866, received from James Bruce a return of his own taxable property and payment of the tax thereon, and required from him, as agent of E. M. Bruce, an account of the cotton sold and on hand as mentioned in the Tax Act of 1865. James Bruce having, in June, 1866, neither cotton nor money of E. M. Bruce or other person, and being no longer agent, refused to render the required account. August 10, 1866, the tax collector estimating the amount of cotton, bought hy James Bruce, at twelve hundred bales, worth $100 a bale, issued against him a double tax execution for $4,584; that is, $2,400 for general tax, and $2,184 for the district tax assessed by the various Boards of Commissioners. September 10,1866, James Bruce filed his suggestion for prohibition, wherein he set forth that, of the cotton purchased by him, all had, before the first of October, 1865, been delivered in Augusta, Georgia, to the order of E. M. Bruce & Co., except one hundred and ninety-three bales, and these were so delivered in October and November, 1865, and that before December, 1865, he was paid in full and his agency had ceased. October 2, 1866, the tax collector filed his answer. At October Term, 1866, Judge Munro ordered the writ of prohibition to issue; and upon appeal from that order the case has been argued, and the opinion is now to be pronounced.
The execution in this case, for the most part, corresponds in form with the precedent prescribed in the Act of 1788, 5 Stat. 52, § 10. It recites that “James Bruce, attorney and agent of Eli Bruce, a non-resident of the State,” has been *265 assessed in the sum of $4,584 for defraying the charges of the State and district, which he has neglected to pay, and commands the levy, by distress and sale of the lands, goods, and chattels of the said James Bruce, of the said sum of $4,584, with costs and charges, and in default of sufficient lands and goods pointed out and produced, commands the arrest and imprisonment of the said James Bruce, until the required sum shall be paid. Indorsed upon it is a statement of the amount of general tax and the amount due to each of the boards of district police, making the aggregate of $4,584. It does not specify double tax or single tax, nor the taxable property, or act done upon which the assessment was made, nor the default of return or of answer to questions, nor any cause besides non-payment, which justified the tax collector in issuing it. But from the suggestion and answer, and the admissions made at the bar, it is plain that it is for double tax upon cotton sold between May and October, or in possession the first of October, and that its justification is rested upon the refusal of James Bruce to make return as agent.
The issuing of an execution without the previous judgment or action of any tribunal besides the collecting officer, is consistent with long-established practice, and is made endurable by consideration of the necessity for speedy and certain collection of supplies to meet the public wants. But it is an extraordinary exercise of arbitrary power, so similar in appearance to the decision and final process of a judicial tribunal, that prohibition, properly applicable only to inferior Courts, is, in this State, familiarly in use for restraining the aberrations and excesses of tax collectors. In cases like this, it occurs, of course, to the mind of a judge, called upon to investigate a charge of usurpation or oppression, that the circumstances, which served to show the occasion and extent of the tax collector’s action, should appear upon his execution, the only paper which informs Sheriff or defendant why property or body should be taken. Since 1788, the changes of *266 law in respect to tbe sale of land(a), and to other matters connected with the collection of taxes, have been such as to require change in the form of a tax execution in some cases, and it is obvious that sometimes, when the Legislature has directed an execution, it has not had in mind the prescribed form.(b) A proper caution is suggested in Kingman vs. Glover, 3 Rich. 35, against bringing to the examination of a tax execution a “strict and technical adherence to form;” but it cannot be considered unreasonable to expect a tax collector, in a case out of the ordinary course, to recite the circumstances which justify his execution; and where these are omitted, the Court must listen readily to proofs on the subject.
We are satisfied that the execution is in part for cotton sold between May and October, 1865, and that, if the act of sale has taken place at all, it took place probably after October, and certainly out of the State, when neither the cotton nor the owner of it was here. The subject of taxation was not within the jurisdiction of the State: person, property, and act done were all beyond its territorial limits, and, of course, to a large extent, the execution was erroneous, and the prohibition must prevail.
But one hundred and ninety-three bales were in this State October 1, 1865, under the control of James Bruce, the agent of E. M. Bruce & Co., for purchasing cotton, and, it is said in behalf of the tax collector, that the tax on cotton on hand October 1st was properly assessed on these. If so, the Court could not, with propriety, undertake the office of apportioning an assessment, when there may have been great difference of value between different lots, and tbe value at which any lot was assessed is rather conjectural than certainly known. This execution would be prohibited, and the tax *267 collector be left to issue another execution for the proper sum. But it is desirable that there should be a decision of the whole matter between these parties, and the Court has attained a resolution upon the whole.
The tax collector says that “ James Bruce made a return of his own property in June, 1866.” Where a return is received, the tax collector is required, under a heavy penalty, to administer an oath(c) which, in substance, is, that the person about to make return will make a full and true return, as required bylaw, of all taxable property and subject of taxation which, at the times provided in respect to each kind of property and subject of taxation, he was possessed of, interested in, or entitled to, either in his own right, or in the right of any other person or persons whomsoever, or as executor, administrator, guardian, trustee, attorney or agent, or in any other manner whatever, according to the best of his knowledge and belief; and that he will give true and just answers, according to the best of his knowledge, to all such questions as shall be asked him touching his liability to taxation under the laws of this State; and that all this he swears without any kind of equivocation or mental reservation whatsoever. For the convenience and safety' of the person liable to taxation, and for the readier detection by public officers of property not returned, distinctions may appear, in an individual’s return and in the tax collector’s books, between taxable property and acts whence proceed impositions upon him in his own right, and other property and acts whence devolve upon him liability for another; but all constitute his return, and for all he is bound personally to pay, if he should not be protected (as it will be shown hereafter he may be) by the termination of his authority to represent another. Did James Bruce make a return ? If so, he was no longer a defaulter liable to double tax, but for taxable property wilfully concealed was liable *268 to a forfeiture of five times the tax thereon, which forfeiture could have been enforced by action.(d) Did he make no return? Then the execution should have been for double the whole assessment; for all he was personally liable, and his payment of part might have been entered as a credit on the execution against him. Did he make a return sufficient in other respects, but refuse to make a full return on oath of all cotton in hand on the first day of October then last past ? Then, according to the express provisions of section seven of the Tax Act of 1865, the probable value of cotton in his hands on the day mentioned should have been assessed, notice of the assessment have been given to him, and if he had not made. the required return of cotton within ten days, the assessment so made — that is, the assessment of probable value — should have been taken for a return, and if the tax had not been paid, execution for single tax should have gone accordingly as it would have done if a return had been made, and payment been neglected. This is in accordance with the usage, which has long prevailed, of a tax-payer’s swearing off the surplus of an excessive assessment made against him,(e) and with the provision hereafter mentioned, for an attorney’s protecting himself by making oath of his renunciation or disclaimer.(f)
It is said that here James Bruce refused to return the cotton that was in his hands on the first day of October'; but when we look to the bond, which was offered and refused, it can scarcely be doubted that this refusal was a disagreement between him and the tax collector, as to his personal liability for the tax on that cotton. When he came to make return, he had neither cotton nor money, nor other property of E. M. Bruce or of E. M. Bruce & Go.; his agency had ceased before the tax was enacted; there had never before been a tax on cotton, and when he settled his accounts with *269 his principal he had no reason to anticipate that such a tax would be laid. He therefore may well be supposed to have objected, aid not unnaturally, to every thing tending to hold him personally liable. In truth he was not personally liable, but that does not seem to have been explained to him, and probably was not understood by the tax collector. The scheme of the regulations, for collection of taxes, ordinarily contemplates only persons and' property in the State. Taxes due by an absent non-resident for property here may, perhaps, be .collected, by execution against him, under which may be sold the specific property which was taxed, or any other property of his in the State, or by special proceedings to forfeit and sell after a year’s notice.(g) But certainly for greater assurance, according to law that has long prevailed, it is the right of the tax collector to look to an inhabitant of the State for taxes upon all property, of which he has possession, or in which he is interested, in any right whatsoever, no matter who may be the owner. When, however, the property was not held by such inhabitant on the day to which the tax relates, or when the possession, and all interest in it, by him for another, has passed from him before the time for payment of the tax, even though such property was in his return, he may, by making oath of such cessation of the right he once had for another, exempt himself from liability for payment, subject to a return of the liability, if the- right for that other be renewed within a year.(h) The proper course in this case would have been for James Bruce to have made a return of-the cotton, such as is contained in his suggestion, and at the same time to have shown, by his oath, the cessation of his agency; and thereupon his liability would have ceased, and the tax collector would have been left to pursue E. M. Bruce & Co., as he might have been advised. There is some difficulty in perceiving that one, who has been agent but is not so *270 at the time of making his return, is bound to notice the property of his principal, wbicb was in bis possession at the time to wbicb the return relates. Tbe earlier Tax Acts contemplate attorneys as having power from their principals at the time of the return, and give effect to their renunciation or disclaimer between the return and day of payment; but the change in the time for the annual session of the Legislature effected by the Constitution of 1790, combined with such provisions of the Act of 1788 as were not altered in 1791, made returns relate to the first day of October preceding ;(i) and however inclined the Court may be to regard regulations as prospective and not retrospective, (Carter v. Burger, tax collector, 1 McMul., 412,) the State has been so long accustomed to the first day of October for taxes on lands and slaves, and to the still more objectionable reference to the first day of January preceding a Tax Act passed in December for the tax on sales of merchandise, and the reference for the cotton on band to the first day of October preceding, is, in the Act of 1865, so express, that the agent’s obligation to make return, with such retrospect, cannot but be admitted ; and fortunate it is that there is a provision which saves him from the injustice of personal liability upon bis showing the truth.
Here James Bruce did not make return of the cotton, nor did be show under oath the cessation of his agency, but the tax collector did not pursue exactly the course prescribed for him, and therefore bis execution must be arrested:
Because it is in part for cotton sold, and therefore exceeds the jurisdiction of the State;
Because it is for double tax on the sum assessed as the probable value, when it should have been for single tax on that sum, just as if that sum had been returned;
And, looking beyond matters of form, because it aims to *271 enforce a personal liability against one who, under the circumstances which really existed, was not intended by the law to be personally liable.
Note by Judge "Wakdlaw concerning the regulations for assessment and collection of State taxes.
(a) Tax Acts. The legislation which has been had in this State, before and since 1776, on the subject of taxes, is so scattered and confused, that it is extremely difficult to trace its history, or to determine precisely the existing law upon some points embraced in it. The earliest Tax Acts of the Province have been lost. (See list of Acts appended to vol. x. Stat. at Large, Nos. 5,12, 68, 96,112, 341.) But all that might have been obtained were not published in the Statutes at Large, when they might have been, and the MSS., with the other contents of the State House, were destroyed in the conflagration of Columbia, Feb., 1865. These omissions in the Statutes at Large are greatly to be deplored, not so much, however, as others, which the compilers chose to make, with reference to Courts, Militia, Slaves and other subjects, which they detached from the chronological order, to be inserted in the last volume, (7, 8, and 9,) where they are not to be found.
Before the adoption of the Federal Constitution, duties on imports and exports, and bills of credit, contributed largely to the revenue required for the public use. Of these a satisfactory view may be obtained by examination of the Acts shown by the General Index, 10 Stat., (words — Duties, Bills of Credit,) and of the appendix to 9 Stat. and Dr. Cooper’s note, 2 Stat. 708.
To direct taxation resort seems alwaj^s to have been had for supply of deficiencies. The earliest Tax Act, which inquiry can now reach, was passed in 1701, 2 Stat. 182. Thenceforward until 1783, after irrbgular intervals, other such Acts were passed, some providing for payment of taxes in several successive years, (1703, 2 Stat. 208; 1716, 2 Stat. 666 ; 1722, 3 Stat. 71, 192,) and the most important, with respect to regulations for collection of taxes, being those just referred to, and those of 1724, 3 Stat. 238 ; 1734, 3 Stat. 383 ; 1760, 4 Stat. 128 ; and 1777, 4 Stat. 365. The longest intervals in which there was no Tax Act were between 1739 and 1753, 1769 and 1777, and 1779 and 1783. From 1783 down, there has been an annual Tax Act. This before 1790 was passed in Charleston in the month of February or March; in 1790, 5 Stat. 149, in Charleston in January ; in 1791, 5 Stat. 188, at the second session of that year and the first held in Columbia, it was passed in December; and in December of every year since, it has been passed.
*271 Motion dismissed.
Dunkin, C. J., and Inglis, A. J., concurred.

Motion dismissed.

Before 1788, every Tax Act contained all the regulations and directions for collection of the taxes it imposed, which were deemed necessary. Some of these were repeated again and again, from 1701 down ; others, introduced by addition or amendment as occasion required, were generally copied from the Act, where they first appear, into every subsequent Act. In February, 1788, regulations intended to be permanent, most of which had before prevailed, were enacted in a Separate Act, and these were omitted in subsequent Acts to raise supplies. Afterwards, alterations and additions were made, and copied from Act to Act until 1803, 5 Stat. 452, when they were made permanent by a supplement to the Act of 1788. Again the process of change and copying went on until 1815, 6 Stat. 7, when the classification of lands (which had been inserted in every Tax Act from 1784 down) was fixed in a form which remained unaltered until 1865, and to it some other general regulations were annexed. After another series of years, in which new regulations were copied time after time, another separate Act was enacted in 1843,11 Stat. 246 ; but unfortunately that Act contained no code of tax regulations, but only such of the changes, introduced after 1815, as wore approved, with some additions. From 1843 to 1849, the Acts to raise supplies contained only the subjects and rates of taxation. In 1849 and subsequent years, additions were made, and the Acts of 1865 and 1866 have copied most of these, and have made other important changes.
The whole mass, out of which the present regulations for the assessment and collection of taxes may be evolved, may now be found in the before-cited Acts of 1788, 1803, 1815, 1843, 1865, and 1866, and in an Act concerning Courts, 1791, 7 Stat. 276, § 18-22. The sections last cited may seem to be misplaced ; the search for them in the Tax Acts, likely to be made, may, however, find there other matters not expected; as for instance, in the Act of 1803, before cited, the authority under which a present Sheriif makes title to land sold by his predecessor. It is understood to be a traditional usage in the House of Representatives to admit, on motion of the Chairman of Ways and Means, at the third reading of a bill to raise supplies, or of a bill to make appropriations, amendments without the previous notice which is required in the case of any other bill; and thus, in the hurry of limited time toward the close of a session, a matter, which would otherwise have been lost, has sometimes been admitted into one of the favored bills, although not entirely congruous to it. Many regulations concerning Boards of District Police, enacted from 1803 onward, were incorporated in tire permanent Acts of 1815 and 1843, or have been transferred to separate Acts which require reports from those Boards. A provision of 1811, § 35, which required names of persons, with the tax paid by each, to be transmitted by the Comptroller-General to the Clerk, was afterwards repeated and then inserted in the permanent Act of 1815, § 11; but, however useful it might be in respect to jury-lists, as well as for other purposes, does not seem to be now regarded.'
(b) Appropriations. Appropriations were, for a long time, usually made in the Tax Acts. The earliest Appropriation Act, in the form now customary, which came after the Constitution of 1790, was passed in 1803, 5 Stat. 473 ; but before that time there had been schedules or estimates of charges, one of which was sometimes appended to the Tax Act, and sometimes embodied in it, 5 Stat. 377, 450. In 1793, 5 Stat. 308, no- estimate is now to be seen, although the last clause of the Tax Act for that year appropriates the money to be raised to. arrearages due and expenses of the current year. In 1777, 1778, and 1779, there appears no estimate and no appropriation to uses inore precise than the public uses. In the provincial times the General Index, Stat. 10, word Appropriations, will show that at first there was only some general purpose indicated toward which the money was applied in particulars not now preserved; that special appropriations and estimates soon prevailed, and may be found in the Tax Act, (see 3 Stat. 313, 344;) that, in 1733, 3 Stat. 186, there was an estimate without Tax Act, and in 1731, 3 Stat. 334, a separate Appropriation Act; and that from 1733 to 1769 were regular estimates.
(c) Time. A distinction must be observed between the commencement of the fiscal year — that is, the time at which begin the annual charges which a Tax Act is intended to meet — and the time to which, in a return to a tax collector, the possession of property or liability to certain taxation is to be referred.
(d) Piscar Tear. In the earliest Provincial Acts, provision is made for the apportionment of an exact sum already due between inhabitants residing within the town-plat of Charleston and other inhabitants of the province, and between the individuals of each of these classes, according to their several liabilities ; and reference to time is made only for fixing the times of assessment and payment. The estimate for 1733, before cited, seems to show that the fiscal year then began, as the legal one did, on March 35. An Act passed March 34,1734-5, 3 Stat. 338, by its title shows that it was intended to defray “the contingent charges of the government for one year, commencing September 39, 1734, and ending September 39, 1735,” and by its preamble declares these charges to be for the current year; and the same may be observed of the Act of December, 1735, 3 Stat. 357. Prom 1731 to 1758 each Tax Act was for the year in which it was passed, beginning 25th of March preceding. In 1759, April, 4 Stat. 103, an Act was passed for defraying the charges from March 25, 1758, to December 31, 1758, inclusive, manifesting a change of the year. Prom 1760 to 1769 each Act was passed in the early part of the year, and was to defray the charges of the year preceding, stating the first day of January as the commencement of the year. The Acts of 1777, 1778, and 1779 in no way designate the time they were expected to meet. The Acts 1783-1790 are each for the year of our Lord in which it was passed, so that the Act of 1788, 5 Stat. 50, does not seem of itself to have worked a change of year. The Acts 1791-1824 were each passed in December, and each for the current year. 1825-1830 there seems in the title of the Tax Acts to have been a misapprehension, as each is said to be for the year following the December in which it was passed. 1831-1840, each is entitled for the year in which it was passed, and from 1841 down each is more specially entitled for the year commencing October preceding. _
(e) Day to wmen kbtubn keeers. Every Tax Act prior to 1791 was wholly prospective, as to the possession of property and liability to any tax imposed. The regulations of February, 1788, provided that under the Tax Acts of that year, contemporaneous with these regulations, the taxable property, or that of which a person liable to taxes was possessed in any right, should be returned by the first Monday of October then next, (October, 1788 ;) that the liability should be for property held in any right on the first day of October then next; that the same rule should prevail as to succeeding taxes and years, and that for taxes on property sold on the first day of October or afterwards, in each year, the seller should make return and payment. Here no retrospect was contemplated. But when in December, 1791, the Tax Act was passed, and reference to the first of October then past was preserved, the times for return and payment were necessarily altered, as necessarily the return made in the spring acquired a retrospective effect. Prom that time forward October first was looked to in the returns of lands and slaves, (see 1803, 5 Stat. 452, 470; and 1805, 5 Stat. 516 ;) and of money at interest, (5 Stat. 386 ;) but the sales of merchandise, 1815-1822, were expressly made to refer to the first day of January preceding each Act, almost a year before. This taxation of sales, by Act passed long after they were made, was in 1823 superseded by a tax on the stock in trade on hand the first day of January, 1824, and so a tax on the stock in hand on the first day of January after the Act continued until 1852, when there was a renewal of the former tax upon sales for the year beginning the first day of January before the Act, and that continued until 1865 inclusive. In 1866 quarterly returns of sales, made during the year beginning the first of January after the Act, were required; and by the Act of I860, the first day of January following, instead of the first day of October preceding, is the day to which taxes on property, imposed by that Act, shall have reference both as to possession and valuation, except where some other date is specially designated, and the income taxed is that which arose in the year beginning the first day of January preceding the Act. The Act of 1865, in the second section imposing the tax, and in the seventh section concerning the return on oath, has express reference to the first day of October, in regard to cotton, turpentine, and resin on hand.
(f) Oath. The oath to be administered to a person who makes a return was prescribed in 1716, 2 Stat. 668, § 15, and, after frequent repetition, was in 1788 made permanent in nearly its original form, having no relation to October or any preceding time. In 1799, 5 Stat. 375, § 25, it was made to have express reference to the first day of October preceding in respect to money at interest, but there, as in many other instances, where the oath is repeated, the words, “ touching the same,” always introduced, would, by a rigid construction, confine its obligation to money at interest, or in other instances to lands and slaves, although other taxable property was returned. The supplementary Act of 1803 omits the oath, but the Tax Act of that year, § 11, repeats it, with special mention of lands and slaves, and so, after intermediate repetitions, does the permanent Act of 1815. A form of oath was afterwards omitted until 1822, 6 Stat. 198, § 5, when a special oath as to sales was prescribed, which was plainly intended to be additional to an oath respecting other matters. This special oath was, 1823, 6 Stat. 224, § 5, altered so as to accommodate it to the change from a tax on sales to a tax on stock in hand the first day of January after the Act, and, so altered, it was annually repeated until 1842 inclusive. In 1843 it was omitted, probably because a permanent provision of that year, 11 Stat. 217, § 5, copied from what had been partly contained in the Act of 1815, § 4, and more fully enacted in 1828, 6 Stat. 376, § 17, and often repeated, enjoins upon every tax collector, under a heavy penalty, to require a return on oath from each person liable to the payment of taxes “of his or her taxable properly” as required by law. The Tax Acts of 1807 and 8, 5 Stat., prescribed a special oath, concerning a penalty for non-residence on a plantation, to be administered to every person who returned more than thirty slaves, and special mention of an oath, as was before said, is made in the Act of 1865, § 7. The form set forth in 1815 has, by the changes which the enactments of 1843, 1865, and 1866 have necessarily produced, been brought substantially to this: “I swear that I will now make a full and true return, as required by law, of all taxable property and subjects of taxation, which, at the times provided in respect to each kind of property or subject of taxation, I was possessed of, interested in, or entitled to, either in my own right or in the right of any other person or persons whomsoever, or as executor, administrator, guardian, trustee, attorney, or agent, or in any other manner whatever, according to the best of my knowledge and belief; and that I will give true and just answers, according to the best of my knowledge, to all such questions as shall be asked me touching my liability to taxation under the laws of this State; and all this I swear without any kind of equivocation or mental reservation whatsoever. So help me God!”
(g) Double Tax. Throughout the series of Acts prior to 1788, there was provision for assessment of a person who failed to make return, and for summary collection from him, in defect of information, of double the amount that the assessor might suppose he ought to be rated at; and this is, in cumbrous phraseology, made permanent by sections 9 and 11 of the Act of 1788.
(h) Concealment. The Act of 1716, 2 Stat. 669, § 17, for voluntary concealment of any part of his taxable property, which any person is guilty of in rendering his account, provides for a forfeiture of the property concealed, to be adjudged in a Court of record. In 1733, 3 Stat. 354, the forfeiture was reduced to treble tax on the part concealed, and nothing said as to the mode in which it should be ascertained and enforced. In 1758, 4 Stat. 57, the forfeiture was raised to five times the value of the tax on what was concealed; and in this form a permanent provision was made by Act of 1788, § 8, and perhaps reference to § 26 was intended. See State vs. City Council, 12 Rich. 731; Slate vs. Allen, 2 McC. 59; Crosby vs. Warren, 1 Rich. 388 ; State vs. Simons, 2 Sp. 761.
(i) Arrears. An Act of 1704 provided for omissions and for collection of arrears the same process which defaulters were subject to. In .4718-19, the Chief Justice was empowered, at the request of the Commissioners appointed to receive the taxes, to grant new executions for arrears and to proceed as against defaulters. In 1723 lists were required to be furnished to the Treasurer, and he was directed to collect arrears by warrants under his hand; and thus the law was repeated again and again until it was made permanent, 1788, § 7, 16. By the supplementary Act of 1803, § 3, the tax collector is authorized to issue executions for all arrears of taxes certified by the Comptroller-General, and he is required to annex to his general return a list of all the taxable property not returned, which has come to his knowledge, or the names and descriptions. By the Tax Act of 1788, § 15, collectors are authorized to collect taxes from defaulters of the five preceding years, who had not paid to their predecessors.
In 1826, § 20, a tax-collector was authorized to issue executions against all persons who were in arrears to his deceased predecessor. In 1827, § 13, another was authorized to renew executions which his predecessor had not caused to be collected ; and in 1828, § 14, he was required to sign executions against defaulters of three and four years standing.
(k) Swearing oee. From 1701 down to 1788, there was provision for a taxable person coming at the time appointed for payment to swear off the excess, which had been imposed upon him by over-rating or undue assessment; and this was permanently enacted by the sixth section of the Act of 1788. The 25th section of that Act relates to the limits of the parish of St. George, Dorchester. An Act of 1779, 5 Stat. 366, § 2, “respecting the division line between the parishes of St. James, Goose Creek, and St. George, Dorchester,” repeals the “sixth” clause of the Act of 1788. Grimke’s P. L. was published in 1790, and was in 1799 the only printed collection then existing of the Acts between 1734 and 1790. It sets forth the Act of 1788, with the sections so numbered that what is in the Statutes at large, published long afterwards, shown to be the 25th, appears as “the sixth.” It can scarcely be doubted that the Legislature intended, in 1799, to repeal the section (25th) which related to the parish line. See State vs. Council of Mount Pleasant, 8 Rich. 214.
(e) Execution. A summary execution against defaulters has prevailed from the earliest period. At first it was issued by a justice of the peace, 1701, 2 Stat. 182; afterwards by the Chief Justice, 1716-1723, 2 Stat..; in 1724-1733, 3 Stat., by the public Treasurer; in 1734, 3 Stat. 388, and ever since, by the inquirers and collectors, subject to the right of the Treasurer or Comptroller-General as to arrears before mentioned.
In 1736, 3 Stat. 443, a form of warrant or execution was prescribed, directed to a constable or provost-marshal, which in substance was repeated in every subsequent tax-act until 1788. The general Act of 1788, 5 Stat. 52, § 10, in specifying the mode for enforcing collection, adopts the form before in use, only adding lands to goods and chattels, and requiring the process to be directed to the constable living nearest to the defaulter’s residence, and no form has since been given. In 1799, the tax collector was required to place his warrants in the hands of the Sheriff only; and this provision, after intermediate repetitions, was confirmed by the general regulations of 1803, with directions for employment of the coroner when the Sheriff is interested. Subsequent enactments impliedly required some change of the form of execution prescribed in 1788. The temporary specific lien, created by the 15th section of the permanent Act of 1843, could not be made available without some special directions to the Sheriff, which the mandatory part of the process would give more properly than oral instructions would; and the same may be said of the special execution against a free negro, 1830-1843, § 2. Executions for arrears, certified by the Comptroller-General, or arrears unpaid to a preceding collector, (cases mentioned under the head inws,) would not consist with the preliminary recital which is prescribed. In these cases, and in others where double tax executions are spoken of, it seems plain that the Legislature has considered it competent foi' a tax collector to adapt his execution to the requirements of the occasion; and the defendant may well complain if, 'in a case out of the ordinary course, a paper requiring a Sheriff, who may know nothing not shown by it, to invade rights of property and person, should not on its face explain why and for what it has been issued.
(m) Non-besidents. Increased taxes, from 1778 to 1783, and from 1793 down, have been imposed upon absentees from the United States, with special exceptions, which have been occasionally varied. These taxes were triple, 1808-1825, except 1813, when they were quintuple; double at all other times, and so fixed in 1843.
The ordinary provision for collection of taxes upon the property of nonresidents has been a return from the person resident here who had possession, with execution against that person, and perhaps against the absent owner, to which the specific properly and his other property here would be subject.
Of absent owners, lands seem most to have attracted the attention of the Legislature, next slaves. In 1734, 3 Stat. 384, § 3, when land owned by a non-resident was not returned, the collectors were directed either to sell wood or timber therefrom, to the amount of the tax the land was liable for, or to let to farm all or any part of it, for a term not exceeding four years, till the tax was paid by the rents; and this provision was repeated until 1784 inclusive, the term of lease having been extended in 1758 to seven years, and in 1764 and afterwards to twenty-one years.
In 1737, 3 Stat. 474, § 5, it was provided that land found to belong to a non-resident, who had no legally constituted attorney or trustee within the province, should be proportionably rated, and if, after notice by publication, the tax, with interest, was not paid within two years, the land should be forfeited to the king, and be considered vacant. In 1777, forfeiture to the State was enacted, and the provision was in substance continued till 1784 inclusive. In 1786, the provision was extended to “tracts of land, negroes, or any other taxable property,” and the time of notice was reduced to one year, and sale at auction directed, with saving of -the rights of infants and feme coverts ; and in this form it was made permanent, 1788, § 19. In 1791, 7 Stat. 276, sales of property for taxes were made subject to regulations, which were applicable to all cases ‘ ‘ of default made by any person in the payment of any tax.” 1795-1798, particular notice was taken of lands which had been sold to persons living in the Northern States and foreign countries, who paid no taxes, and tax-collectors were enjoined to inquire, report, and collect “ agreeably to the mode prescribed for selling the property of those who make default in paying taxes.” If this authorized immediate sale of the lands of nonresidents, a return to the mode prescribed in 1788 seems to have been made, 1801, § 10, when twelve months notice.was required before sale; and the supplementary Act of 1803, § 6, confirms the enactment of 1801, with directions for sale in lots and saving of tlie rights of persons who had obtained new grants.
In the separate Act of 1843, section 6 requires return by each person liable to the payment of taxes for his or her taxable property ; section 12, in case any taxable property (perhaps of an inhabitant) shall be removed from the State after the first day of October, and before payment of taxes, subjects the property of the owner which may remain to liability for the “taxes on that which has been carried from the Stateand section 11 constitutes taxes on lands, slaves, goods and chattels, specific liens “ on the said lands, slaves, goods and chattels, for one year from the time the liability to taxes attached upon the owner or proprietor thereof..”
The question has not yet been presented, whether a'tax execution against a non-resident is a cumulative remedy, which may be had in lieu of those prescribed in 1788 and 1803, or in connection with them. Many expressions of the Legislature bear on this question. Before 1716, only the inhabitants residing in the province were assessed; in 1716, planters and others residing, living, or otherwise interested in the province; in 1751, inhabitants and others interested in the province; in 1788, “ persons living in the State who are possessed of any lands, slaves,” &c., “all persons whosoever anyways liable to pay taxes,” “any taxable person 1792, “ all persons anywise liable to pay the taxes hereby imposed.” In 1815, § 4, a return of taxable property is required from the owner, “unless the owner is absent from the State.” The Act of 1843 contains the words above extracted from it, and also provides for taxes upon taxable property in this State, to which persons who reside out of the United States are entitled. The Act of 1788 directs warrants after ten days exposure of the list of defaulters, “if any person or persons whosoever shall neglect to pay in his or her tax;” and the Act of 1803 speaks of “all persons liable to pay any tax,” of taxes and arrears of taxes on lands of non-residents, and directs warrants against “any person who shall make default in payment of taxes.”
From 1716 until the same was made permanent, 1788, § 12, it was repeated that a person removing between his return and the time appointed for payment, without having paid his taxes, should be liable to execution as a defaulter.
Under the head oath will be seen above the long-continued resolution of the Legislature to hold liable, for the tax on any property, the person in the State who, in the absence of the owner, has possession thereof or interest therein. The word “agent” was first introduced into the oath in 1777; but still the words “legally constituted” attorney or trustee were retained in the section which authorized forfeiture and sale of the lands of non-residents, afterwards extended to goods, and made permanent, as before shown. Until 1791, the possession or interest in autre droit was always spoken of as existing at the time of the return, for the return, as before shown under the head day to which retwrn refm'g, had no retrospect; but in 1791, and afterwards, the return, which every one liable to taxation was required to make of the taxable property held in his own right, or any other right, had relation to the first day of October preceding; and the liability, imposed by the law and enforced by the oath, must have embraced every one who on that day had possession or interest, and could not discharge himself, by swearing, at any time before the time appointed for payment, that his liability in auti’e droit had ceased.
This right to discharge arises from an equitable construction of the 18th section of the Act of 1788. That section is a perpetuation of a provision which was introduced in 1789 in mitigation of the Act of 1737 and preceding Acts. The attorney or trustee had been held personally liable for the tax on land, notwithstanding his renunciation or disclaimer before the tax was levied. In 1739, 3 Stat. 528, § 4, was added, “unless he shall make oath that ho hath bona fide renounced his power before the payment of the tax becomes due, without having done it to avoid the payment of the said tax, ’ ’ and shall not again be attorney or trustee within one year. In 1758, the provision was extended to taxes on slaves, and other taxable goods, as well as those on lands, and then in 1788 it was made permanent. By the express words, an attorney or trustee might, by renunciation, release himself from liability, even after he had made return; a fortiori, he is released by entire completion of the purposes for which he was appointed, or other cessation of his power and interest, without his voluntary termination of them; and surely by such cessation before a return was required from him, not less than after. If a legally constituted attorney would be thus discharged from liability, how much more an overseer, a bailee, or other irregular agent, a guardian who has surrendered the property to his ward become of age, an executor, administrator, or other trustee who has been removed from his trust, or a temporary occupant, who has yielded possession to the owner for whom he held. If discharge can be had from a tax, which the agent assumed by his return made before he yielded his authority, it would be strange to enforce his personal liability, when not only his power ceased, but the property which is taxed was taken out of his reach before he had reason to expect that a tax on it would be imposed.

 7 Stat. 270, § 18, 26, and see notes (a) and (m) at the end of the case.

 See note (l).

 See note (f).

 See notes (g) and (h).

 See note (k).

 See note (m).

 See note (m).

 See note (m).

 See note (e).